

**FILED**

Apr 21 2015, 10:00 am

*Kevin S. Smith*

**CLERK**

of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
| --- | --- |
| Steven E. Ripstra | Gregory F. Zoeller |
| Ripstra Law Office | Attorney General of Indiana |
| Jasper, Indiana | |
| | Brian Reitz |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| Brian L. Harrison, | April 21, 2015 |
| *Appellant-Defendant,* | Court of Appeals Case No. 74A01-1407-CR-328 |
| v. | Appeal from the Spencer Circuit Court |
| State of Indiana, | The Honorable Wayne A. Roell, Special Judge |
| *Appellee-Plaintiff.* | Cause No. 74C01-1301-FB-020 |

**Mathias, Judge.**

[1] Brian Lee Harrison ("Harrison") was convicted in Spencer Circuit Court of Class B felony dealing in methamphetamine, Class D felony illegal possession of anhydrous ammonia, Class D felony possession of chemical reagents or precursors with the intent to manufacture methamphetamine, and Class A misdemeanor possession of paraphernalia. Harrison also admitted to being an habitual offender and was sentenced to an aggregate term of thirteen years of

incarceration. Harrison appeals and presents seven issues, which we reorder and restate as:

I.     Whether the State presented sufficient evidence to support Harrison's convictions;

II.     Whether Harrison's convictions for possession of ammonia and possession of precursors are lesser-included offenses of the greater offense of manufacturing methamphetamine;

III.     Whether the trial court abused its discretion in admitting into evidence information from a mobile phone the police seized from Harrison's car;

IV.     Whether the trial court abused its discretion in refusing to give Harrison's proffered jury instruction on an alibi defense and in instructing the jury with regard to the charged offense of possession of precursors;

V.     Whether the trial court abused its discretion by admitting evidence regarding certain telephone calls, one of which was made by Harrison while he was in jail;

VI.     Whether the trial court abused its discretion in permitting the prosecuting attorney to read language from a published opinion of this court during the State's closing argument; and

VII.     Whether the trial court abused its discretion when it admitted evidence of Harrison's nickname, "Bam Bam."

[2]     We reverse Harrison's convictions for possession of anhydrous ammonia and possession of precursors as they constitute lesser-included offenses of the greater offense of manufacturing methamphetamine but affirm Harrison's convictions for manufacturing methamphetamine and possession of paraphernalia.

## Facts and Procedural History

[3]     On January 28, 2013, Spencer County Sheriff's Deputy Jim Taggart ("Deputy Taggart") was driving his patrol car on a county road when he saw two vehicles, a black Pontiac and a white pickup truck, stopped in the road. The two vehicles

drew Deputy Taggart's attention, as he thought that the truck may have collided with the rear-end of the Pontiac. Instead, the pickup drove away and turned right at a nearby stop sign. Deputy Taggart drove past the Pontiac and observed it in his rear-view mirror. As he did so, the Pontiac quickly accelerated in reverse up a hill. The driver of the Pontiac lost control of the car, drove it into a ditch, and hit a log, which bounced the car into the air. The car then came to a stop in the ditch. Deputy Taggart turned his patrol car around to approach the crashed Pontiac.

[4] A passenger in the car, later identified as Jason Gee ("Gee"), exited the car, ran across the road, and disappeared into a wooded area. The driver of the car, later identified as Harrison, managed to climb out of the driver's side door, which was wedged against the ditch, and also fled into the wooded area.

[5] Deputy Taggart exited his patrol car, walked toward the Pontiac, and saw smoke coming from the front passenger floorboard. He then saw a small fire located next to a tank in the car and a clear container with a white powder inside. Deputy Taggart put out the fire. He then noticed that a mobile phone, located in the console, had been ringing. Deputy Taggart opened the phone and read to dispatch the numbers that had been calling the phone in the car. Deputy Taggart also looked through the text messages on the phone.

[6] Deputy Taggart then began to search the vehicle, where he found a bag containing a scale and a leather wallet. The wallet contained an Indiana identification card, an Indiana Department of Correction card, a debit card, a

casino card, and a resort card, all of which identified Harrison. A spoon and cigarette rolling papers were also found in the car.

[7] Indiana State Police Trooper Ted Clamme ("Trooper Clamme") of the clandestine laboratory clean-up team was dispatched to the scene. Trooper Clamme described what he saw in the vehicle as a "very early stage" methamphetamine lab, using the "Nazi method." Tr. P. 209. Trooper Clamme found in the car several items used in the manufacture of methamphetamine, including: 24.31 grams of pseudoephedrine, crushed pseudoephedrine pill powder, a tank of ammonia, a bottle of "Heet" (an isopropyl alcohol-based anti-freeze agent), syringes, a glass jar, plastic tubing, and a measuring spoon. Trooper Clamme explained that every item needed for the manufacture of methamphetamine was present, save lithium. However, he explained that the lithium could have been destroyed in the fire.

[8] In the meantime, Kati Richard ("Richard"), the 911 director for the Spencer County Sheriff's Department, was at home when she received a telephone call from dispatch to warn her that her house was near the area where the suspects in the Pontiac had fled. Shortly thereafter, Richard's dog began to bark; she looked outside and saw Harrison sitting in the woods near her house.[1] Richard then called dispatch to tell them she had found one of the potential suspects. However, Harrison was not apprehended at that time.

---

[1] Richard's brother was a childhood friend of Harrison's.

[9]     Gee was taken into custody later that day. Harrison was arrested at a later date and eventually charged with Class B felony manufacture of methamphetamine, Class D felony illegal possession of anhydrous ammonia, Class D felony possession of precursors with intent to manufacture methamphetamine, and Class A misdemeanor possession of paraphernalia. The State also alleged that Harrison was an habitual offender.

[10]    At trial, the State introduced into evidence, over Harrison's objection, a recorded telephone conversation he had with Gee while in jail. In the call, Harrison stated, "I'm kind of hurt, man but — got f**king ammonia. I think I have ammonia in my lungs." Appellant's App. p. 243. Harrison was also occasionally referred to at trial by his nickname, "Bam Bam." Tr. pp. 7, 9, 152, 166-68, 170-71. Harrison objected to some of these references but not all. *See* Tr. pp. 152, 170-71. At the close of the evidence, the trial court read the pattern jury instruction regarding the charged crime of possession of precursors, to which Harrison objected. The trial court also refused to read to the jury Harrison's tendered alibi instruction. During the State's closing argument, the trial court overruled Harrison's objection to the prosecuting attorney reading a portion of this court's opinion in *Dawson v. State*, 786 N.E.2d 742 (Ind. Ct. App. 2003), which dealt with the definition of manufacturing methamphetamine. The jury found Harrison guilty as charged, and the trial court subsequently sentenced Harrison to an aggregate

term of thirteen years of incarceration.[2] Harrison now appeals.

## I. Sufficiency of the Evidence

Harrison first claims that the evidence is insufficient to support his conviction for manufacturing methamphetamine.[3] When reviewing a claim that the evidence is insufficient to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). We consider only the probative evidence supporting the verdict and any reasonable inferences which may be drawn from this evidence. *Id.* We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

### A. Manufacturing Methamphetamine

The statute defining the crime of manufacturing methamphetamine provides in relevant part that "(a) A person who . . . knowingly or intentionally . . .

---

[2] Specifically, the trial court sentenced Harrison to the advisory term of ten years on his conviction for Class B felony manufacturing methamphetamine, the advisory term of one and one-half years on the Class D felony convictions for possession of precursors and possession of anhydrous ammonia, and one year on the conviction for Class A misdemeanor possession of paraphernalia. The trial court ordered all of the sentences to run concurrently. The trial court also imposed a three-year sentence for the habitual offender adjudication, which it ordered be served consecutively to the other sentences.

[3] Harrison claims generally that the evidence is insufficient to support his convictions. However, he focuses his argument solely on the sufficiency of the evidence supporting his conviction for manufacturing methamphetamine.

manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony[.]" Ind. Code § 35-48-4-1.1(a).[4]

[13] Harrison claims that he was never found in actual possession of any of the items found in the car and that the State therefore was required to prove constructive possession. Harrison, however, was not charged with or convicted of *possession* of methamphetamine under section 35-48-4-1.1(a)(2); he was charged with and convicted of *manufacturing* methamphetamine under section 35-48-4-1.1(a)(1). *See* Appellant's App. p. 13 ("Harrison did knowingly or intentionally manufacture methamphetamine[.]"); Appellant's App. p. 216 (final instruction setting forth elements of manufacturing methamphetamine).

[14] Indiana Code Section 35-48-1-18 defines "manufacture" as:

> the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

No statutory requirement states that the manufacturing process must be completed or that a final product must be present before it applies. *Vanzyll v. State,* 978 N.E.2d 511, 518 (Ind. Ct. App. 2012); *Bush v. State*, 772 N.E.2d 1020, 1022-23 (Ind. Ct. App. 2002).

---

[4] We refer to the version of the statute in effect when Harrison committed his crimes.

Here, Harrison's mobile phone, wallet, and identification were located inside the car. The police found in the car a total of 24.31 grams of pseudoephedrine, crushed pseudoephedrine pill powder, a tank of ammonia, a bottle of "Heet," syringes, a glass jar, plastic tubing, and a measuring spoon, constituting every methamphetamine precursor except lithium. Trooper Clamme identified the set up in the car as an early-stage methamphetamine lab. From this circumstantial evidence, the jury could reasonably conclude that Harrison manufactured methamphetamine, even though no final product was present. *See Bush*, 772 N.E.2d at 1022-23.

*B. Constructive Possession of Precursors*

To the extent that Harrison's argument regarding constructive possession is directed at his conviction for possession of precursors, sufficient evidence sufficient supports a finding that Harrison constructively possessed the precursors. Constructive possession is established by showing that the defendant has both the intent and capability to maintain dominion and control over the contraband. *Floyd v. State*, 791 N.E.2d 206, 210-11 (Ind. Ct. App. 2003), *trans. denied*. In cases where the accused has exclusive possession of the premises on which the contraband is found, an inference is permitted that he or she knew of the presence of contraband and was capable of controlling it. *Id.* However, when possession of the premises is non-exclusive, this inference is permitted only if some additional circumstances indicate the defendant's knowledge of the presence of the contraband and the ability to control it. *Id.* Among the recognized additional circumstances are: (1) incriminating statements made by

the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) the contraband being in plain view; and (6) the location of the contraband being in close proximity to items owned by the defendant. *Id*.

Here, the precursors were found in Harrison's vehicle, but Gee was also in the car with him. Thus, Harrison's possession of the premises was non-exclusive, and additional circumstances must indicate Harrison's knowledge of the presence of the contraband and the ability to control it. *See id*. Here, these circumstances include: (1) Harrison made statements that he had ammonia in his lungs; (2) Harrison fled the vehicle as Deputy Taggart approached it; (3) the precursors were found in an early-stage methamphetamine lab; (4) the methamphetamine lab was in plain view in the front floorboard of the vehicle; and (5) Harrison's mobile phone and wallet were found in close proximity to the methamphetamine lab. From this, the jury could reasonable conclude that Harrison constructively possessed the precursors found in the vehicle.

## II. Lesser Included Offenses

Harrison also claims that, even if the evidence was sufficient to support his conviction for manufacturing methamphetamine, his convictions for possession of anhydrous ammonia and possession of precursors with the intent to manufacture are lesser-included offenses that must be vacated.

Indiana Code section 35-38-1-6 provides that if a defendant is charged with an offense and an included offense in separate counts and is found guilty of both

counts, "judgment and sentence may not be entered against the defendant for the included offense." An "included offense" is defined as an offense that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

Ind. Code § 35-41-1-16. A lesser-included offense is necessarily included within the greater offense if it is impossible to commit the greater offense without first having committed the lesser offense. *Bush*, 772 N.E.2d at 1023-24. If the evidence indicates that one crime is independent of another crime, it is not an included offense. *Iddings v. State*, 772 N.E.2d 1006, 1017 (Ind. Ct. App. 2002).

[20] The possession of precursors can be a lesser-included offense of the greater crime of manufacturing methamphetamine. As we explained in *Bush*:

> We accept that it is impossible to knowingly or intentionally manufacture methamphetamine without first possessing the chemical precursors of methamphetamine with the intent to make the drug. Methamphetamine cannot be conjured up out of thin air. The sole practical difference between these two offenses is that one may be guilty of possessing chemical precursors with intent to manufacture without actually beginning the manufacturing process, whereas the manufacturing process must, at the very least, have been started by a defendant in order to be found guilty of manufacturing methamphetamine.

772 N.E.2d at 1024.

[21] In *Bush*, we held that the defendant's conviction for possession of precursors had to be vacated because no direct evidence recovered indicated that Bush had yet succeeded in completing a "batch" of the drug. *Id*. Thus, we held that the same evidence establishing Bush knowingly or intentionally manufactured methamphetamine also established that he possessed methamphetamine precursors with the intent to manufacture the drug. *Id*. "It [was] impossible to fairly state that the manufacturing and possession of precursors offenses in [*Bush*] were clearly independent of each other." *Id*.

[22] In contrast, in *Iddings*, a case handed down the same day as *Bush*, we came to the contrary conclusion. In *Iddings*, the police recovered completed methamphetamine at Iddings' home in addition to precursors in large quantities and in proximity to other items associated with manufacturing methamphetamine manufacturing. 772 N.E.2d at 1017. Thus, evidence existed that Iddings had already manufactured methamphetamine *and* possessed the chemical precursors of methamphetamine with the intent to manufacture more of the drug, such that his conviction for possession of precursors was not included in his conviction for manufacturing methamphetamine. *Id*.

[23] In the present case, we agree with Harrison that the facts of the present case are closer to those in *Bush* than in *Iddings*. Here, unlike in *Iddings*, no evidence of a completed manufacture of methamphetamine existed. Instead, the police found an early-stage methamphetamine manufacturing process that contained no actual

methamphetamine. Thus, as in *Bush*, it is impossible to fairly state that the manufacturing and possession of precursors offenses are clearly independent of each other. We therefore reverse Harrison's convictions for possession of anhydrous ammonia and possession of precursors and remand with instructions that the trial court vacate the convictions and sentences on these counts.

## II. Admission of Evidence Discovered on Mobile Phone

[24] Harrison also claims that the trial court abused its discretion in admitting into evidence information gleaned from the mobile phone found in the console of Harrison's car. When a defendant challenges the constitutionality of a search following a completed trial, the issue is one of whether the trial court properly admitted the evidence. *Casady v. State*, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010). Questions regarding the admission of evidence are entrusted to the sound discretion of the trial court. *Fuqua v. State*, 984 N.E.2d 709, 713-14 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we review the court's decision on appeal only for an abuse of that discretion. *Id.* The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.* Regardless of whether the challenge is made through a pretrial motion to suppress or by an objection at trial, our review of rulings on the admissibility of evidence is essentially the same: we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we also consider any undisputed evidence that is favorable to the defendant. *Id.*

[25] Both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution provide that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV; Ind. Const., art. 1 § 11. These protections against unreasonable governmental searches and seizures are a principal mode of discouraging lawless police conduct. *Friend v. State*, 858 N.E.2d 646, 650 (Ind. Ct. App. 2006) (citing *Jones v. State*, 655 N.E.2d 49, 54 (Ind. 1995); *Terry v. Ohio*, 392 U.S. 1, 12 (1968)). When the police conduct a warrantless search, the State bears the burden of establishing that an exception to the warrant requirement is applicable. *Id*.

[26] It has long been held that abandoned property is not subject to Fourth Amendment protection. *Campbell v. State*, 841 N.E.2d 624, 627 (Ind. Ct. App. 2006); *Wilson v. State*, 825 N.E.2d 49, 51 (Ind. Ct. App. 2005); *Miller v. State,* 498 N.E.2d 53, 55 (Ind. Ct. App. 1986), *trans. denied*. The same is true under Article 1, Section 11 of the Indiana Constitution. *See Campbell*, 841 N.E.2d at 627. However, this rule is inapplicable if the abandonment occurs after an improper detention.

[27] Here, it is clear that both Harrison and Gee abandoned the car and fled into the woods upon seeing Deputy Taggart. Nor did Harrison abandon his property after an improper detention; they fled as Deputy Taggart approached to investigate the wreck of the Pontiac in the ditch. Accordingly, Harrison cannot now claim that he had a protectable interest in the abandoned mobile phone. *See Campbell*, 841 N.E.2d at 630 (holding that defendant abandoned handgun underneath car

before he was seized and therefore the handgun was not subject to protections of Fourth Amendment or Article 1, Section 11); *People v. Daggs*, 34 Cal. Rptr. 3d 649, 651 (Cal. Ct. App. 2005) (holding that defendant abandoned cell phone which he left behind in a store after fleeing when being confronted for attempting to steal merchandise and therefore police did not unconstitutionally search phone to determine the owner of the phone); *United States v. Washington*, 536 Fed. Appx. 810, 812 (10th Cir. 2013) (holding that defendant had no reasonable expectation of privacy in cellular phone left in motel room), *cert. denied,* 134 S. Ct. 1328 (2014).

### III. Jury Instructions

[28] Harrison next argues that the trial court erred in instructing the jury. The instruction of the jury lies within the trial court's sound discretion, and we review the trial court decisions with regard to jury instructions only for an abuse of that discretion. *Shelby v. State*, 986 N.E.2d 345, 360 (Ind. Ct. App. 2013), *trans. denied*. To constitute an abuse of discretion, an instruction that is given to the jury must be erroneous, and the instructions viewed as a whole must misstate the law or otherwise mislead the jury. *Winkleman v. State,* 22 N.E.3d 844, 849 (Ind. Ct. App. 2014), *trans. denied*. In determining whether the trial court abused its discretion when it refused to give a tendered instruction we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record supporting the instruction; and (3) whether the substance of the instruction is covered by other instructions. *Shelby*, 986 N.E.2d at 360*.* When a defendant seeks reversal based on instructional error, he must demonstrate a reasonable

probability that substantial rights of the complaining party have been adversely affected. *Id.*

## A. Precursors Instruction

[29] Harrison first challenges the propriety of the instruction given by the trial court regarding possession of precursors. This instruction stated:

> The crime of possessing chemical reagents or precursors with the intent to manufacture a controlled substance is defined by statute as follows:
>
> A person who possesses two or more chemical reagents or precursors with the intent to manufacture a controlled substance commits a Class D felony.
>
> Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:
>
> 1. The Defendant;
>
> 2. possessed 2 or more of the following: pseudoephedrine, *which the Court instructs you is a chemical reagent*, the salts, isomers, and salts of isomers of a substance identified in subdivisions (1) through (3), *which the Court instructs you is a chemical reagent*, anhydrous ammonia or ammonia solution (as defined in I.C. 22-11-20-1), *which the Court instructs you is a chemical reagent*, organic solvents, *which the Court instructs you is a chemical reagent*, or hydrochloric acid, *which the Court instructs you is a chemical reagent*.
>
> 3. with the intent to manufacture methamphetamine.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty of possession chemical reagents or precursors with intent to manufacture a controlled substance, as Class D felony.

Appellant's App. p. 220 (emphasis added). Harrison claims that this instruction improperly infringed upon the right of the jury to determine both the law and the facts with regard to the definition of a precursor. We disagree.

[30] We first note that the instruction, which is taken from the Indiana pattern jury instruction,[5] is a correct statement of the law. Indiana Code section 35-48-4-14.5 defines what substances are precursors. Included among these are: pseudoephedrine, or the salt, isomer, or salt of isomer of pseudoephedrine; anhydrous ammonia or ammonia solution; and organic solvents. *See* I.C. § 35-48-4-14.5(a)(2), (4), (5), (6). Thus, the definition of a chemical precursor is established by statute, not the jury. *See Russell v. State*, 182 Ind. App. 386, 401, 395 N.E.2d 791, 800-01 (1979) (noting that statute defined marijuana as a controlled substance and that trial court therefore had a duty to instruct the jury that marijuana was a controlled substance). The question for the jury was not whether pseudoephedrine, organic solvents, or ammonia are controlled substances; this is established as a matter of law by statute. The question for the jury was whether Harrison possessed two or more of those substances with the intent to manufacture methamphetamine.

---

[5] The State appears to argue that the instruction must be a correct statement of the law because it was taken from the Indiana Pattern Jury Instructions. We note, however, that pattern jury instructions have not been formally approved by the Indiana Supreme Court, and certain pattern instructions have even been held to not be a correct statement of the law. *See Clay City Consol. School Corp. v. Timberman*, 918 N.E.2d 292, 295 (Ind. 2009); *Boney v. State*, 880 N.E.2d 279, 294 (Ind. Ct. App. 2008). Still, pattern jury instructions are given preferential treatment during litigation, and the preferred practice is to use the pattern instructions. *See Timberman*, 918 N.E.2d at 295; *Boney*, 880 N.E.2d at 294.

[31] With regard to Harrison's argument that this impedes upon the jury's right to determine the law and the facts in a criminal case, we note that the jury was properly instructed with regard to this role. *See* Appellant's App. p. 215. Our supreme court has held that the jury's right to determine both the law and the facts does not mean that the jury may ignore the law. *See Holden v. State*, 788 N.E.2d 1253, 1255 (Ind. 2003) (noting that it is improper for a court to instruct a jury that they have a right to disregard the law and that, notwithstanding Article 1, Section 19 of the Indiana Constitution, a jury has no more right to ignore the law than it has to ignore the facts in a case), *aff'd on reh'g*, 799 N.E.2d 538.

[32] Accordingly, we are unable to conclude that the trial court abused its discretion in instructing the jury with regard to chemical precursors.

### B. Tendered Alibi Instruction

[33] Harrison also claims that the trial court abused its discretion in refusing to give to the jury his tendered alibi instruction, which stated: "you have heard evidence that at the time of the crime charged the accused was at a different place so remote or distan[t] that he could not have committed the crime. [The] State must prove beyond a reasonable doubt the accused's presence at the time and place of the crime." Tr. p. 524.[6] Regardless of whether this is a correct statement of the law, we conclude that no evidence in the record supports the instruction and that the substance of the instruction was covered by other instructions.

---

[6] Harrison's proffered instruction was not included in the Appellant's Appendix, but the trial court read the proposed instruction into the transcript.

[34] With regard to the evidence supporting the instruction, Harrison simply notes that the charging information did not set forth the specific time of day that the crime took place and that the State's witnesses who identified him at or near the scene of the crime did not establish the time of day. This, however, ignores the fact that the parties stipulated that the incident occurred at 12:30 p.m. Tr. pp. 494-95. As Harrison admits, the State presented evidence indicating that he was at the scene of the crime.

[35] Harrison claims evidence existed supporting the giving of an alibi instruction, referring to his notice of alibi and the testimony of his ex-girlfriend Tasha Hatfield ("Hatfield"). According to the notice of alibi, Harrison and Hatfield were in Owensboro, Kentucky at the time of the crime. Specifically, the notice claimed that Harrison drove to Owensboro at approximately noon to take Hatfield home from the hospital, then drove her to her place of employment, stopped to eat in Owensboro, drove to Rockport where Harrison filled prescriptions, then returned to Hatfield's home in Grandview, Indiana, where they picked up Hatfield's daughter at the school bus stop at 3:20 p.m.

[36] At trial, however, Hatfield did not corroborate the claims made in the notice of alibi. Hatfield testified that she fainted at work on the day of the crime and was taken to the hospital. She also stated that Harrison picked her up from the hospital and that they filled a prescription at approximately 10:50 a.m. Harrison then drove her home, which was approximately ten minutes away. She claimed that she and Harrison fell asleep at approximately 11:30 a.m., and that when she awoke at approximately 2:30 p.m., Harrison was not there. Even if this evidence

were credited, it does not mean that Harrison could not have been at the scene of the crime at 12:30 p.m. while Hatfield was asleep. Under these facts and circumstances, we cannot say evidence supported the giving of Harrison's tendered alibi instruction.

[37] Furthermore, other given instructions adequately explained to the jury that the State had to prove beyond a reasonable doubt that it was Harrison who was at the scene of the wrecked Pontiac, manufacturing methamphetamine. The jury was instructed that Harrison was presumed innocent, that the State had to prove each and every element of the charged crimes beyond a reasonable doubt, and that Harrison was alleged to have knowingly or intentionally committed the crimes on or about January 28, 2013. Thus, we cannot say that the trial court abused its discretion in concluding that the instructions given to the jury adequately explained the State's burden to prove that Harrison was present at the scene of the crimes at approximately 12:30 p.m. on January 28, 2013, which necessarily means that the State had to prove that Harrison was not in Owensboro or otherwise with Hatfield.

[38] In short, the trial court did not abuse its discretion in instructing the jury.

## IV. Admission of Recorded Jail Telephone Calls

[39] Harrison next argues that the trial court erred in admitting evidence regarding jailhouse telephone calls made between him and Gee and between Hatfield and Steven Pointer ("Pointer"), an inmate at the jail. Again, questions regarding the admission of evidence are entrusted to the sound discretion of the trial court, and

we review the trial court's decision only for an abuse of that discretion. *Fuqua*, 984 N.E.2d at 713-14. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id*.

*A. Call Between Hatfield and Pointer*

[40] Harrison first complains of the admission of evidence regarding a telephone call made between his ex-girlfriend, Hatfield, and Pointer, another inmate at the jail. A recording of this call was not admitted; instead, the State asked Hatfield if she remembered certain exchanges with Pointer, specifically:

> Mr. Pointer said to you "What's up?" On the call you say "Oh nothing. Been running from the po-po all day." He said "Running from the po-po?" You said "Yeah, they got Bams [i.e., Harrison] posted up. They ain't got him yet, but they're close." He said "They got him posted up?" And you said "Yeah, but I can't talk about it no more. They're in - they're on them deep." Do you remember that conversation with Mr. Pointer?

Tr. p. 396. Hatfield claimed that she did not recall this conversation clearly and denied that she was running from the police. The State also later asked Hatfield if she remembered telling Pointer, "Hey, Gee's in there, but I got the other one. I got mine with me." Tr. p. 398.

[41] On appeal, Harrison claims that the admission of these statements violated the rule against hearsay and the Confrontation Clause of the Sixth Amendment to the United States Constitution.

[42] Hearsay is defined as "(1) a statement that is not made by the declarant while testifying at trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c); *see also Amos v. State*, 896 N.E.2d 1163, 1168 (Ind. Ct. App. 2008). Hearsay is generally inadmissible. *Amos*, 896 N.E.2d at 1168 (citing Ind. Evidence Rule 802).

[43] The State claims generally that jailhouse phone calls are generally admissible. *See King v. State*, 985 N.E.2d 755, 759 (Ind. Ct. App. 2013) ("Generally, recordings of telephone calls made from jail are admissible when the defendant discusses the crime for which he is incarcerated."), *trans. denied*. However, the telephone conversation between Hatfield and Pointer is not a recording of a conversation where the *defendant* discussed the crime for which he was incarcerated.

[44] Moreover, it is clear that Hatfield's out-of-court statements were introduced in order to prove the truth of the matter asserted, i.e., that she and/or Harrison had been running from the police and that Gee had been caught by the police. The State offers no argument as to why these statements are subject to any hearsay exception, nor are we aware of any. Accordingly, we must conclude that these statements were hearsay and that the trial court abused its discretion in admitting them into evidence.

[45] However, this does not mean that Harrison's convictions must be reversed. We will not reverse a defendant's conviction if the error was harmless. *Teague v. State*, 978 N.E.2d 1183, 1188-89 (Ind. Ct. App. 2012) (citing *Turner v. State,* 953 N.E.2d 1039, 1059 (Ind. 2011)). An error is harmless if substantial independent evidence

of guilt satisfies the reviewing court that no substantial likelihood exists that the challenged evidence contributed to the conviction. *Id.* Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party. *Id.* If the erroneously admitted evidence was cumulative of other evidence, the admission is harmless error for which we will not reverse a conviction. *Id*. (citing *Lehman v. State,* 926 N.E.2d 35, 37 (Ind. Ct. App. 2010)).

[46] Here, the admission of the evidence regarding Hatfield's telephone conversation with Pointer was cumulative of other admitted evidence and therefore harmless. Deputy Taggart testified that a man matching Harrison's description fled from the crashed Pontiac, and Harrison's wallet, identification cards, and telephone were found inside the car. Richard, a woman who had known Harrison for years, saw Harrison hiding in the nearby woods shortly after Harrison fled the scene of the crash. Under these facts and circumstances, we conclude that the evidence regarding Hatfield's conversation with Pointer was harmless error.[7]

*B. Call Between Harrison and Gee*

[47] Harrison also claims that the trial court abused its discretion in admitting into evidence the recorded telephone conversation between Harrison and Gee while

---

[7] We also reject Harrison's claim that the admission of this evidence violated his rights under the Confrontation Clause. Harrison was able to cross-examine Hatfield regarding her statements; thus, no confrontation issue exists. Pointer's side of the conversation was not only trivial and harmless, but also non-testimonial. *See King*, 985 N.E.2d at 758 (noting that a testimonial statement is one where the primary purpose of the conversation was to prove past events potentially relevant to later criminal proceedings).

Harrison was in jail. Harrison presents numerous arguments as to why this recording should not have been admitted.

[48] Harrison first briefly claims no foundation exists for the admission of the recording. "To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated." *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. Authentication of an exhibit can be established by either direct or circumstantial evidence. *Id*. Absolute proof of authenticity is not required, and the proponent of the evidence need establish only that a reasonable probability that the document is what it is claimed to be. *Id*. Once this reasonable probability is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility. *Id.*

[49] Here, Richards identified the recording as one taken at the jail on the relevant date, and Gee's girlfriend, Marriah Barrett ("Barrett") testified that the recording was of a call between Harrison and Gee. This is sufficient to lay a foundation for the admission of the recording.[8]

[50] Harrison also contends that the statements on the tapes constitute inadmissible hearsay. Harrison's statements on the tape, by definition of Evidence Rule 801(d)(2), are not hearsay, even if offered to prove the truth of the matter

---

[8] Harrison briefly mentions the Federal Wiretap Act and the Indiana Wiretap Act but makes no cognizable argument that the jail telephone calls violated either act.

asserted. *See Banks v. State*, 761 N.E.2d 403, 406 (Ind. 2002) ("A party's own statement offered against that party is not hearsay.") (citing Evid. R. 801(d)(2)). Gee's statements in the recording are relatively innocuous. The only statement that might be harmful to Harrison was Gee's reply of "Me, too," when Harrison stated that he had "ammonia in [his] lungs." Tr. p. 243. To the extent that this was offered to prove the truth of the matter asserted—that Gee had ammonia in his lungs—we cannot say that it affected Harrison's substantial rights. This is especially true given the substantial evidence identifying Harrison as the one who was in the car where the methamphetamine manufacturing was taking place: the car in which the methamphetamine lab was found belonged to Harrison, his wallet, identification, and telephone were inside the car, Deputy Taggart saw a person matching Harrison's description flee the car, and Richard saw Harrison hiding in the nearby woods shortly after Harrison fled.

[51] Harrison also claims that the admission of the recording violated his right to confront the witnesses against him. This can only refer to Gee's statements on the recording. Again, however, most of Gee's statements were innocuous, and the prejudicial statement regarding the ammonia in his lungs is insufficient to require reversal, even if it were a testimonial statement.[9]

---

[9] The record does not indicate that Gee's statement was testimonial, i.e., made to prove past events potentially relevant to later criminal proceedings. *See King*, 985 N.E.2d at 758.

## V. Prosecutor's Statements During Closing Argument

[52] Harrison also claims that the trial court erred in overruling his objection to the prosecuting attorney's act of reading to the jury a portion of a published opinion of this court. During the State's closing argument, the prosecuting attorney read a portion of this court's opinion in *Dawson v. State*, 786 N.E.2d 742, 748 (Ind. Ct. App. 2003), as follows:

> The Court of Appeals in reviewing this definition of manufacturing said "We conclude that once an individual crushes up pills in order to separate the ephedrine from the pill binders the manufacturing process has begun. Focusing upon the key phrases in the definition this determination we observe that manufacture is production, preparation, or processing of a controlled substance by extraction from substances of natural origin." They went on to say, "The main ingredient in ephedrine -- the main ingredient is ephedrine and is the substance which is chemically converted into methamphetamine. The crushing of the pills into a powder form indicates not only the possession of the precursor ephedrine, but that it also begins the extraction process. This sufficiently meets the definition of manufacturing in order to support a conviction for dealing in methamphetamine by knowingly manufacturing it." That's the Indiana Court of Appeal -- Court of Appeals.

Tr. pp. 548-49. Harrison makes no claim that this is an inaccurate quotation, nor does he claim that it was an improper statement of the law. Instead, he claims that it is improper to read case law to a jury. However, this is not accurate. We have held before that it is proper for counsel to argue both law and facts in a closing statement. *Nelson v. State,* 792 N.E.2d 588, 593 (Ind. Ct. App. 2003), *trans. denied.* Our supreme court has held that reading case law to the jury is proper in final argument so long as it is clear that the prosecutor is reading or

referring to a separate case. *Hernandez v. State,* 439 N.E.2d 625, 630 (Ind. 1982) (citing *Griffin v. State*, 275 Ind. 107, 114, 415 N.E.2d 60, 65 (1981)).

[53] Here, the prosecuting attorney made it clear that she was reading from a prior opinion of this court in a separate case. The trial court instructed the jury that the arguments of counsel were not evidence. Appellant's App. p. 232. Accordingly, we cannot say that the trial court abused its discretion in overruling Harrison's objection to the prosecuting attorney's reading from *Dawson* during the State's closing argument.

## VI. References to Defendant's Nickname

[54] Lastly, Harrison claims that the trial court erred in permitting the use of Harrison's nickname, "Bam Bam," during trial. The State argues at some length that Harrison waived this argument by failing to object to each instance in which Harrison was referred to as "Bam" or "Bam Bam." We agree.

Harrison did not object to each instance in which his nickname was mentioned at trial. *See, e.g.*, Tr. pp. 152, 170-71. A party must generally continue to object and obtain a ruling for each individual instance of allegedly inadmissible evidence. *Hutcherson v. State,* 966 N.E.2d 766, 770 (Ind. Ct. App. 2012), *trans, denied*.

[55] Waiver notwithstanding, Harrison's argument is unavailing. Harrison claims that the use of his nickname was irrelevant and unduly prejudicial. In general, all relevant evidence is admissible. Ind. Evidence Rule 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Ind. Evidence Rule 403. The trial court has discretion to permit the admission of even marginally relevant evidence. *Wilson v. State*, 997 N.E.2d 38, 43 (Ind. Ct. App. 2013), *trans. denied* (citing *Thompson v. State,* 671 N.E.2d 1165, 1171 (Ind. 1996)).

[56] Our supreme court has held that the use of a defendant's nickname may be relevant to the issue of identity. *McAbee v. State*, 770 N.E.2d 802, 805 (Ind. 2002). The use of a nickname is questionable, however, where no apparent reason exists not to use a defendant's proper name, and, even more so where the nickname itself carries at least the implication of wrongdoing. *Id*.

[57] Here, the nickname "Bam Bam" has no apparent implication of wrongdoing or criminality.[10]  Moreover, the use of Harrison's nickname was relevant to proving his identity and his ownership of the Pontiac from which he fled and the mobile phone found therein. The prior owner of the Pontiac testified, "I sold it to a feller -- his name was Bam Bam."  Tr. p. 152. The prior owner did not know Harrison's actual name. Moreover, several of the messages on the phone referred

[10]  In fact, "Bam Bam" is the name of a lovable, exceptionally strong infant character on the animated series "The Flintstones."  *See* http://flintstones.wikia.com/wiki/Bamm-Bamm_Rubble; http://www.imdb.com/character/ch0000639/.

to "Bam" or "Bam Bam." Under these facts and circumstances, we conclude that the trial court did not abuse its discretion in permitting references to Harrison's nickname. *See People v. Salgado*, 678 N.E.2d 648 (Ill. App. Ct. 1997) (holding that use of defendant's nickname of "Bam Bam" was not improper where the name itself did not carry a negative connotation that was immediately recognizable and where defendant's friends knew and identified him by that name).

## Conclusion

In summary, we hold that the State presented sufficient evidence to convict Harrison of manufacturing methamphetamine. However, Harrison's convictions for possession of anhydrous ammonia and possession of precursors are lesser-included offenses of the greater offense of manufacturing methamphetamine and must be reversed. Harrison may not now assert a claim of improper search or seizure in his mobile phone, which he voluntarily abandoned. The trial court did not commit reversible error in admitting evidence regarding the telephone call between Hatfield and Pointer or between Harrison and Gee. Nor did the trial court err in permitting the prosecuting attorney to read from a published opinion of this court during the State's closing argument. Lastly, the trial court did not abuse its discretion in permitting references to Harrison's nickname of "Bam Bam."

Accordingly, we affirm Harrison's convictions for Class B felony manufacturing methamphetamine and Class A misdemeanor possession of paraphernalia but reverse his convictions for Class B felony possession of anhydrous ammonia and

Class B felony possession of chemical precursors and remand with instructions that the trial court vacate the convictions and sentences thereon.[11] Harrison's habitual offender adjudication remains.

Najam, J., and Bradford, J., concur.

---

[11] Because the trial court ordered Harrison's sentences to be served concurrently, Harrison's aggregate sentence will be unaffected by our holding.