## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 06 2019, 10:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Daquoine D. Harriston, *Appellant-Defendant,* | December 6, 2019 |
| v. | Court of Appeals Case No. 19A-CR-1059 |
| | Appeal from the St. Joseph Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Jane Woodward Miller, Judge |
| | Trial Court Cause No. 71D01-1805-F1-9 |

**Mathias, Judge.**

[1] Following a jury trial in St. Joseph Superior Court, Daquoine Harriston ("Harriston")[1] was convicted of two counts of Level 1 felony attempted murder and sentenced to an aggregate term of fifty years of incarceration. Harriston appeals and presents one issue: whether the State presented sufficient evidence to support Harriston's convictions. Finding that ample, though circumstantial, evidence supports the convictions, we affirm.

## Facts and Procedural History

[2] In May 2018, Aleatha Carter ("Carter") lived on Miami Street on the southeast side of South Bend, Indiana with her wife, Torkika Tibbs ("Tibbs"), and Carter's children S.S., D.S., and C.G. Carter's family was from the west side of South Bend, and there are neighborhood and gang rivalries between people from these two parts of town. A gas station convenience store was located about a half a block away from Carter's home on the other side of Miami Street at the intersection of Miami Street and Bowman Street. There is also an alley behind the gas station that connects Bowman to Donald Street and runs parallel to Miami Street. The following diagram is based on the evidence presented at trial, specifically aerial photographs of the area at issue and the expositional testimony of the witnesses. *See* Ex. Vol. State's Exs. 1, 112. It is included only as an aid to the reader.

---

[1] The defendant's surname is also spelled as "Hairston" in portions of the record. *See* Appellant's Confidential App. p. 186. The parties, however, both spell the defendant's name as "Harriston," and we therefore use this spelling.



[3] Shortly before noon on May 2, 2018, S.S., D.S., and C.G. went to the gas station to buy snacks. As the siblings approached the corner of Miami and Bowman, they saw two African-American men in the parking lot of the gas station. One of the men wore his hair in dreadlocks, and the other had a shorter, "low fade" haircut. Tr. Vol. 1, p. 55. After making eye contact, the man in dreadlocks asked S.S., "What you on," meaning "What's the deal?" Tr. Vol. 1, p. 121. As the parties exchanged words, the man in dreadlocks showed the siblings a handgun he had in his pants and pulled at the handle of the gun. S.S.,

D.S., and C.G. decided to go back home. Once back home, S.S. told her mother that two men had just threatened them with a gun.

[4] Carter, Tibbs, and the children then went out onto their front porch and looked left toward the gas station where the confrontation had taken place. Tibbs looked in the other direction, at the intersection of Miami and Donald streets and saw two men running toward the house. The two men yelled, "Loose Screws," and made signs with their hands, both indicating their affiliation with a southeast-side street gang. Tr. Vol. 1, pp. 50, 101. Tibbs saw that the men were preparing to shoot and warned her family. As the family attempted to run back into the house, the two men opened fire, shooting at the house approximately fifteen times. Several bullets hit the house, leaving bullet holes in the front of the house, the screen door, and the windows. Carter was angry and prepared to chase the shooters but changed her mind when she realized that S.S. had been shot in the arm.

[5] Carter described both shooters as African-American men, one with dreadlocks and wearing a white t-shirt, and the other with a shorter fade haircut. Tibbs got a good look at only one of the shooters, whom she described as having dreadlocks and wearing a white t-shirt. S.S. stated that the shooter with dreadlocks wore a white t-shirt, and that the other shooter had a fade haircut and also wore a white t-shirt. C.G. too described one of the shooters as having dreadlocks and the other a shorter fade haircut. D.S. stated that the shooter who had initially flashed his handgun had dreadlocks and that the other had a

fade haircut. S.S., D.S., and C.G. all identified the shooters as the same men who had confronted them near the gas station moments before.

[6] D.R. also lived on Miami Street at the corner Miami and Donald. He was home at the time of the shooting and heard gunfire coming from the north side of his home. He looked toward Miami Street and saw a young African-American man walking backwards, holding a gun in his hand. D.R. saw the man shoot six or seven more times. The man wore a white tank top. *Id*. at 65. D.R. heard another gun being fired at the same time and saw a second man walking backwards in the same direction as the first man. He saw an object in the second man's hand, but could not tell if it was a gun. The second man also had on a white shirt, but had his hair in dreadlocks.

[7] Another bystander, K.H., was working at a lighting business on the corner of Miami and Donald Streets and also heard the sound of multiple gunshots. He looked outside and saw two African-American men running toward and then down the alley. One of the men had dreadlocks and was carrying a handgun, and the other had shorter hair. Yet another bystander, J.J., lived nearby on the 1300 block of Donald Street. At approximately noon that day, he noticed two men, one of whom had dreadlocks, run down the alley very fast and go inside a house two doors down from him.

[8] South Bend Police Department Officer John Riddle ("Officer Riddle") was on patrol nearby at the time of the shooting. Within seconds of the shooting, the residents of the Carter-Tibbs home flagged him down at the corner of Miami

and Bowman streets and informed him about the shooting. Officer Riddle saw spent shell casings on the ground outside the home and called for an ambulance to transport S.S. to the hospital. Carter, however, insisted upon driving her daughter to the hospital herself. At the hospital, S.S. underwent treatment for the gunshot wound in her upper right arm. The police ultimately located fourteen shell casings near the house.

[9] Later that afternoon, the police deduced that the shooters might be located at the house on Donald Street where J.J. had seen the two men run and enter. The police went to the house and asked to speak with Harriston and Kahala Wright, both of whom they suspected in the shooting. Wright and Harriston, however, refused to come out of the house, even after being asked to do so by Wright's mother. Eventually, the two surrendered to the police. Inside the house, the police found a white t-shirt and a white sleeveless tank top; both shirts had been rolled up and hidden between two toy chests.

[10] Detective Jim Taylor ("Detective Taylor") attempted to interview Harriston at the police department that afternoon but could not locate a family member of Harriston's. As Harriston did not turn eighteen until May 10, 2018, the police needed the permission of a parent or guardian to speak with him. The police therefore released Harriston.

[11] Later that day, P.Q., who lived near the house where Wright and Harriston had been found, was mowing his lawn when he saw Harriston by the fence line between P.Q. and his neighbor's yards. When he asked Harriston what he was

doing, Harriston claimed to be looking for his cell phone. K.G., who lived next to P.Q., also saw Harriston and asked what he was doing. Harriston also told K.G. that he was looking for his cell phone. Since K.G. did not know Harriston, she thought it was odd that he would be looking for his cell phone in her yard. After Harriston left, P.Q. searched the area where Harriston had been looking and saw a handgun. After finding the gun, P.Q. called the police, who arrived at the scene and recovered the weapon, later identified as a Smith and Wesson 9 mm handgun. Subsequent testing revealed that four of the shell casings found at the scene of the shooting had been fired from this handgun.

[12] The police eventually obtained security video footage from the gas station where the initial encounter took place. The video shows two men, one with dreadlocks and wearing a white t-shirt and the other with shorter hair and wearing a white tank top. The men enter the gas station and leave shortly thereafter. Outside, the man with dreadlocks stares at someone at the corner of Miami and Donald Streets. Both men then walk toward the corner and eventually go out of sight of the camera. Shortly thereafter, the men run down Bowman Street to the alley, where they run in the direction of Donald Street. Based on the reaction of the bystanders in the video, the shooting takes place less than a minute after the two men ran down the alley and disappeared from view of the camera. When Detective Taylor watched the video, he immediately recognized the two men in the video as Harriston and Wright. In the video, Harriston is wearing a white tank top. Wright can be seen wearing dreadlocks, and the butt of a handgun can be seen sticking out of his pocket, which was

sagging because of the weight of the gun. Harriston's pocket is also seen sagging in the video, as if weighed down by a heavy object. As they run down the alley in the video, both men hold the objects in their respective pockets.

[13] On May 10, 2018, Harriston's eighteenth birthday, Detective Taylor again interviewed Harriston. Despite being confronted with the video evidence, Harriston denied having anything to do with the shooting and claimed to have been playing video games at the house on Donald Street at the time of the shooting. When detective Taylor left the interview room, Harriston called his girlfriend and told her that the police were questioning him about "the shooting." Tr. Vol. 1, p. 242.

[14] The State charged Harriston on May 14, 2018, with two counts of Level 1 felony attempted murder, alleging that Harriston, acting with the specific intent to kill, took a substantial step toward killing S.S. and D.S. by shooting at them. The State also filed an information for a criminal gang enhancement, alleging that Harriston "was a member of a criminal gang while committing a felony offense and committed the felony offense at the direction of or in affiliation with a criminal gang." Appellant's Confidential App. p. 7; *see also* Ind. Code § 35-50-2-15 (setting forth the requirements of the criminal gang sentencing enhancement).

[15] A bifurcated jury trial took place on March 18–21, 2019. At the conclusion of the first phase of the trial, the jury found Harriston guilty of both counts of attempted murder. The second phase of the trial concerned the criminal gang

enhancement, and at the conclusion of this phase of the trial, the jury found that the State had proven the criminal gang enhancement beyond a reasonable doubt. On May 2, 2019, the trial court sentenced Harriston to twenty-five years on the first count of attempted murder, a concurrent term of twenty years on the second count of attempted murder, and a consecutive sentence of twenty-five years on the criminal gang enhancement, for an aggregate term of fifty years of incarceration. Harriston now appeals.

## Discussion and Decision

[16] Harriston argues that the State failed to present sufficient evidence to prove his identity as the shorter-haired shooter.[2] When reviewing a claim that the evidence is insufficient to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses. *Harrison v. State*, 32 N.E.3d 240, 247 (Ind. Ct. App. 2015) (citing *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)), *trans. denied*. We instead respect the exclusive province of the jury to weigh any conflicting evidence. *Id.* We consider only the probative evidence supporting the verdict and any reasonable inferences that may be drawn from this evidence. *Id.* We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

---

[2] Harriston makes no claim that there was insufficient evidence to prove that the shooters intended to kill S.S. and D.S. or that the shooting constituted a substantial step toward committing the crime of murder, nor does Harriston claim that there was insufficient evidence to support the criminal gang sentence enhancement.

[17] In claiming that the evidence is insufficient to establish his identification as one of the shooters, Harriston notes that there were no fingerprints or DNA that linked him to crime. However, this is not necessary, as "[i]dentity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom." *Cherry v. State*, 57 N.E.3d 867, 877 (Ind. Ct. App. 2016) (citing *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990)), *trans. denied*. "When the evidence of identity is not entirely conclusive, the weight to be given to the identification evidence is left to the determination of the jury, as determining identity is a question of fact." *Harbert v. State*, 51 N.E.3d 267, 275 (Ind. Ct. App. 2016) (citing *Whitt v. State*, 499 N.E.2d 748, 750 (Ind. 1986)), *trans. denied*. Moreover, identification testimony need not be unequivocal to sustain a conviction. *Cherry*, 57 N.E.3d at 877 (citing *Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996)).[3]

[18] It is true that none of the eyewitnesses who testified at trial specifically identified Harriston as one of the shooters. But the evidence clearly supports the jury's finding that Harriston was the shooter with the shorter hair. S.S., C.G., and D.S. all testified that the two shooters were the same individuals who had confronted them on the way to the gas station. The two men who confronted

---

[3] Harriston cites *Hampton v. State*, 961 N.E.2d 480, 486 (Ind. 2012), which held that a jury must be instructed that there is a "qualitative difference between direct and circumstantial evidence with respect to the degree of reliability and certainty they provide as proof of guilt." Harriston admits, however, that the jury was so instructed in the present case. Nevertheless Harriston appears to argue that the evidence did not overcome every reasonable hypothesis of innocence. This is not the correct standard of review on appeal. It has long been held that "[o]n appellate review of circumstantial evidence of guilt, [the court] need not determine whether the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but rather whether inferences may be reasonably drawn from that evidence which support the verdict beyond a reasonable doubt." *Bustamante*, 557 N.E.2d at 1317–18 (citing *Kidd v. State*, 530 N.E.2d 287, 287 (Ind. 1988)).

the siblings outside the gas station are clearly seen in the security video footage. A gun can be seen in the pocket of the man with dreadlocks, and a heavy object can be seen in the pocket of the man with the shorter hair. The video also shows these same two men run to and then down the alley that led to where the shooting took place. And, based on the reactions of the other people in the video, the shooting took place less than a minute after this. When he viewed this video, Detective Taylor immediately recognized the two men as Harriston and Wright. The jury also saw this video and saw Harriston, and made a factual determination that Harriston was the man depicted in the video.

[19] Moreover, after Harriston was released from the police station, a man matching his description was seen looking for something near a fence line between two homes near where the shooting took place hours earlier. The police found one of the handguns used in the shooting in the area where Harriston had been looking. Although there were some inconsistencies in the testimony of the eyewitnesses regarding what the shooters were wearing, this is not uncommon. Moreover, Carter, S.S., C.G., and D.S. all identified one of the shooters as having dreadlocks and the other as having a shorter fade haircut, which matched the men seen in the video and matched Wright and Harriston, respectively. Several of the eyewitnesses testified that one of the shooters wore a white tank top, which Harriston is seen wearing in the security video. A search of the house where Harriston was found revealed a white tank top matching the one Harriston is seen wearing in the video, inexplicably hidden in an odd place.

# Conclusion

From all of these facts and circumstances, the jury could reasonably conclude that Harriston was the man wearing a white tank top with shorter hair in the video and that Harriston was one of two men who shot at the Carter-Tibbs home minutes after the security video footage at the gas station. Accordingly, we affirm the judgment of the trial court.

Affirmed.

Robb, J., and Pyle, J., concur.